## MATTER OF VICTORIA ELAINE CARTER AND CINDY ANN SPALDING

[No. 519, September Term, 1973.]

*Decided April 17, 1974.*

634

The cause was argued before MENCHINE, MOORE and LOWE, JJ.

*Gerard Meola,* with whom was *Leonard Bernstein* on the brief, for appellants.

*Bernard A. Raum* and *James I. Keane, Assistant Attorneys General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Edward W. Newell, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

On February 1, 1973 juvenile petitions were filed in the Circuit Court for Baltimore County, sitting as a Juvenile Court, against Victoria Elaine Carter, age 11, and Cindy Ann Spalding, age 13, charging that both were delinquent children and children in need of supervision within the meaning and intent of Code, Art. 26, § 70-2.[1] The petition against Victoria Elaine Carter alleged that

> "on 1-29-73 and for one year prior thereto in the County aforesaid [County of Baltimore] the respondent, Victoria Elaine Carter, did engage in various forms of sex practices and participated in the consumption of controlled or prohibitive [sic] drugs. It is further alleged that the respondent is ungovernable and so deports herself as to endanger herself and others.
>
> "It appears that the respondent is in need of

1. New Code: Courts and Judicial Proceedings (hereinafter referred to as "Courts Art.") § 3-804.

supervision, guidance, treatment, and/or rehabilitation beyond that being offered."

The petition against Cindy Ann Spalding alleged similarly that

"on 1-31-73 in the County aforesaid an investigation by the Baltimore County Police Department revealed that the respondent had consumed controlled and prohibitive narcotics and engaged in acts of sexual intercourse and sexual perversion with an unknown number of male and female adults for a period of more than one year. The respondent is ungovernable and beyond the control of her parent, deports herself in such a manner as to be a danger to herself and others and is in need of care and treatment."

On the same day, an adjudication was made by Juvenile Master Kahl that both girls were children in need of supervision and in need of care and treatment.[2] They were committed to the custody of the State Department of Juvenile Services. On February 7 they were ordered taken to the Maryland Children's Center for evaluation, to be returned to court one month thereafter. On March 7 the report from the Maryland Children's Center was filed and a disposition hearing was held before Juvenile Master Peach. He recommended their retention in the custody of the Department of Juvenile Services for placement and a Commitment Order, signed by him on March 7, was approved by Judge Jenifer. On March 12 counsel for both respondents filed general exceptions to the findings of the master and requested a hearing *de novo* on the entire matter pursuant to Maryland Rule 908 e 3. On May 3 separate adjudicatory and disposition hearings upon the exceptions were held before the Juvenile Court (Jenifer, J.). In a verbal opinion the court found both children to be in need of supervision, to be committed to the care and custody of the Department of Juvenile Services for placement. A formal Order was adopted by the court on May 7, 1973. At the time of argument on this appeal, both children were in foster

2. The Memorandum of Master Kahl read in part as follows: "Police investigation indicates that these young girls have been victimized by a

homes, the parents having been granted limited visitation rights. From these adjudications and dispositions both respondents have taken this appeal.

At the hearing before Judge Jenifer, Officer Joseph Price of the Baltimore County Police Department, Dundalk Station, testified that in the early morning hours of January 31, 1973 he was summoned to City Hospital to investigate a possible rape and overdose of narcotics. He was met by Mr. Lenlie Carter, father of appellant, Victoria Elaine Carter, who advised him that his daughter had taken a white tablet that had dilated her eyes and affected her speech and equilibrium, and that he wanted her treated for the drug and examined for possible sexual intercourse. He explained that she had confessed to having intercourse with one Sheldon Coon on January 29. Questioned about the matter by the officer in her parents' presence, Elaine at first denied the intercourse ("she denied having any, denied to her mother and denied to her father . . ."), but eventually she admitted that on January 29 she had climbed out her bedroom window in her parents' apartment at 2007 Bear Ridge Road and slipped down to the apartment immediately below where she was let in by Coon. Several persons were there, all nude. Coon gave her a pill that "made her float," after which she engaged in sexual acts with Coon and others including two women. According to the officer, Elaine's speech during this recitation was impaired, and her parents assisted him in eliciting details and the names of those involved in the "party." Following the initial questioning Elaine remained at the hospital (with her parents) for out-patient treatment.

At approximately 6:30 a.m., in response to a phone call by Officer Price, Cindy Ann Spalding was brought to the

---

group of adults in the Dundalk area and elsewhere, for purposes of sexual abuse and drug experimentation. It is not known at this point just how much damage has already been done, physically and psychologically, to these girls. The situation is one of the most serious that I have encountered in my four years with the Juvenile Court.

"Both girls are in need of medical treatment immediately, and notwithstanding whatever wishes the parents of the girls may have at this time, I find them to be Children in Need of Supervision. . . ."

Dundalk police station by her mother. The Carters also went to the station, taking with them Victoria Elaine and the Reverend Robert Gatney, the pastor of a church in Baltimore attended by both families. Mr. Price and another police officer talked with the girls in an atmosphere of some commotion: the parents "insisted on the girls giving the information. They were at sometime[s] . . . yelling at the girls and the girls being upset, crying, they were trying to calm them down. They were trying to help and assist getting all the information they could." Cindy Ann Spalding confessed to the police that on the evening of the 29th at about 9:00, Coon helped her out of her bedroom window and drove her to the Bear Ridge Road apartment where she had intercourse with several males and two adult women performed unnatural acts upon her. She stated that on previous occasions she had had sexual relations with other men including one who lived in the basement of her mother's house. With the consent of the parents the girls gave written statements to the police incorporating the substance of their oral statements. They were then taken to University Hospital for examination for possible intercourse (City Hospital apparently did not have the necessary facilities). The same day they were given over to the custody of the Department of Juvenile Services.

On cross-examination, Price was asked if he had given the *Miranda* warnings at the police station prior to beginning questioning. He indicated he had announced "to everyone in the room" that anything they said could be used against them in a court of law if they were charged. On redirect he stated he never considered the girls or their parents to be in custody: "They volunteered all of this information to begin with, and it was so bizarre I started asking questions to try to pinpoint dates and times and individuals." The Carters "wanted everybody named and wanted them arrested and punished." Mrs. Spalding wanted "this Mr. Coon arrested and charged, because he had beaten Cindy Spalding and she was afraid for her. . . ." Rev. Gatney was in the forefront of the questioning and at one point, the officer testified, he "had to threaten to arrest him just to keep him quiet." At

another time, the parents began to walk out, themselves disenchanted with the investigation: "They said they did not like the way [we were] handling it. We were paid off just like everybody else." Price told them "they could go if they wanted to, but they were not going to get anywheres.[3] We talked it over and used cool heads."

Over her counsel's objection to her being called by the State, Victoria Elaine Carter confirmed the essentials of her statement to the police. She testified she had met Sheldon Coon through the church and known him about a year. She had attended about fifteen "parties" with him in the apartment below her parents', in each case without their knowledge. Her escape from her parents' surveillance, "bizarre" but evidently effective, was managed by dropping sleeping pills given her by Coon in whatever they were drinking that evening, usually coffee. They had never become suspicious. Downstairs she would receive her pill from Coon and eventually everyone, as many as "twenty-five, thirty," "took off their clothes and made sex." On other occasions they would go instead to the Lacottis' and similar events would transpire. Asked why she went out with Coon, who was "just an old man" to her, the eleven-year-old Victoria Elaine explained:

> "A. Time I was under the pill.
>
> THE COURT: What, would he [Coon] give you a pill and then you'd go out with him?
>
> A. Yes.
>
> THE COURT: How about when you went to the Lacottis', what would happen?
>
> A. I'd get a pill before I went."

She recalled telling Coon once that she was going to confess her activities to her parents, but "he said, if you do, I'll kill you."

On cross-examination Victoria Elaine stated that her brother, Steve, age 19, who had since left home, had first

---

3. Meaning, it appears, they needed assistance and would accomplish nothing on their own.

taken her to the parties. Indeed it was he and Coon who helped her make her way back through her bedroom window after a night's events.

Cindy Ann Spalding also testified over her counsel's objection and his instructions to her on the record not to testify. She identified her written statement made to the police and affirmed its truth. On cross-examination she responded to counsel's question as to whether she had been advised that she did not have to make the statements:

> "A. Well, we more or less made it on our own. We figured we could save some more kids, but they gave us no rights or anything.
>
> THE COURT: Give you what?
>
> A. Any kind of rights, we thought we were doing the State a favor."

Called by counsel for her daughter, Mrs. Carter testified as to her "intention in going to City Hospital and calling the police:"

> "A. Well, we thought that these men should be taken in custody to keep this from happening to other little children, we thought they should be apprehended and all these rings broken up in the city; we thought they'd be interested to know this."

Reverend Gatney testified and stated that he had also "want[ed] to see justice" since "[t]hese men [were] guilty for assaulting these children," but the police had been incredulous for a while: ". . . if you say anything like that [he paraphrased Price] people are going to put you in jail."

At the conclusion of the adjudicatory hearing the court found that the girls had been "associated in immoral sexual activities for a period of at least three months prior to January 31, 1973;" had been "given drugs of a narcotic nature and [had] indulged in the taking of the drug itself;" had engaged in activities "certainly of a nature that would not have been permitted [by their parents] had they been known about;" had "deported themselves so as to injure or

endanger themselves or others;" had "endangered their own welfare" in being "thrown in" with Coon, and had, in sum, "gone through a very traumatic experience" requiring guidance, treatment or rehabilitation.

In challenging the Order of Court declaring them to be children in need of supervision and committing them to the care and custody of the Department of Juvenile Services for placement, appellants make the following contentions:

1) their statement (oral and written) to the police should have been suppressed at the *de novo* hearing, and they should have been permitted to cross-examine Officer Price on the issues of voluntariness and *Miranda* warnings;

2) they were denied their constitutional right to refuse to testify at the *de novo* hearing;

3) the court erred in deciding the issue of need of supervision based on "all the statutory definitions rather than limiting the issue to the charge alleged in the petition";

4) the court erred in denying the motion of Cindy Spalding challenging venue and the power of the Circuit Court for Baltimore County to hear the allegation that she was a child in need of supervision;

5) the evidence was insufficient to justify a finding that they were children in need of supervision.

With respect to contentions 1) and 2) appellants strenuously urge that the decision of the Supreme Court in the celebrated case of *In Re Gault,* 387 U. S. 1 (1966) is applicable to a proceeding to determine whether a child is in need of supervision. Appellants argue that there is no valid distinction between delinquent and CINS (child in need of supervision) proceedings and that a CINS case falls within the ambit of *Gault.* Consequently, it is asserted, Fifth Amendment guarantees are applicable to a CINS proceeding so that the child may choose to remain silent and is also entitled to a determination by the court of a Motion to Suppress on the ground of constitutional involuntariness

and under the rule of *Miranda v. Arizona*, 384 U. S. 436 (1966), which was made applicable to delinquency proceedings by *Gault*.

For the reason stated in Section I, *infra*, we find *Miranda* inapplicable upon the facts disclosed in this record.

On the broad constitutional issues presented we also conclude in Section II that *Gault* is not applicable to a CINS proceeding.

The remaining substantive contentions we find to be without merit. Finally, at the conclusion of this opinion we deny appellants' motion set forth in brief to "strike portions of the record" and we also formally deny appellee's "motion ne recipiatur" addressed to the aforesaid motion to strike.

I

Counsel for appellants contend that the questioning by the police at the hospital and at the police station was custodial interrogation within the meaning of *Miranda* and assert that appellants were not adequately apprised of their rights under *Miranda* and "could not have knowingly waived" them, and that in the totality of the circumstances their statements were not voluntary but a product of their youth, lack of sleep or "alleged" weakened condition from a drug, and above all of the combined coercion of the police, their parents and their minister.

The short answer to this contention is that appellants were not in custody at the time of the statements in question. To hold otherwise would be to find custodial interrogation in any case where a police officer was present and participating or where the questioning took place at a police station. *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The Supreme Court noted this was what it had meant in *Escobedo v. Illinois*, 378 U. S. 478 (1964) when it spoke of an investigation that was "no longer a general inquiry into an unsolved crime but [had] begun to focus on a particular suspect. . . ." 378 U. S. at 490. Custody thus requires a significant deprivation of

the freedom of one upon whom the eye of criminal suspicion has begun to focus. To see the matter thus is to perceive the considerable distance separating custodial interrogation from the questioning that took place here.

The evidence shows that Officer Price went to City Hospital in response to a call to police headquarters from Mr. and Mrs. Carter. There he was met by parents who were alarmed by their discoveries concerning their child and determined to seek exposure and punishment of the persons responsible. What triggered police involvement in the case was thus the anger of parents who believed their child to have been victimized and who were demanding police action. This position of the parties — and not that suggested by counsel for appellants who claims "they were *treated* by the police as victims and not defendants" — continued when the Carters arrived at the station a few hours later accompanied by the Spaldings and Rev. Gatney. Mrs. Spalding, of course, had been called to the station with her daughter by the police, but her real motivation in being there was unquestionably her desire to see Coon prosecuted. Indeed the general picture conveyed of the scene is of a chorus, or a tumult, of competing voices — police, parental, and pastoral — all anxious to uncover the facts of the girls' abuse and "to see justice." Thus while Officer Price saw fit to give an unparticularized *Miranda* warning "to everyone in the room," we consider this of small account. His role in questioning the girls and receiving their written statements received the parents' unqualified support — indeed he was their "adversary," it would appear, only in holding the questioning to an orderly course and insisting on separating fact from fiction. We find in all this no resemblance to the situation contemplated by *Miranda*: any restraint upon the girls' freedom at this point was at their parents' initiative and with their continued cooperation, and the overriding "focus" of misconduct during the interrogation was not upon the girls but upon their exploiters. This was merely confirmed the next day when the juvenile master found inadequate evidence to support a juvenile delinquency petition against the girls, and on the day thereafter when

warrants were sworn out for the arrest of at least four of the adults named by them.

Because the oral and written statements of the girls to the police did not stem from custodial interrogation, the State was not required to demonstrate compliance with the procedural safeguards of *Miranda,* as a condition of their admissibility. For the same reason the court below did not err in refusing to permit defense counsel "to question the officer about what warning he did give these children" before the statements were introduced. (It may be noted that counsel did in fact, following admission of the statements, and some seven transcript pages later, cross-examine the officer in detail on precisely this matter.)

Appellants argue that the statements should have been rejected in any event as the product of the girls' youth, their fatigue or possible weakness from drugs, and the combined coercion of their parents and minister. The Supreme Court in *Gault, supra,* wisely cautioned that where admissions of juveniles are involved, the greatest care must be taken to assure they are not the result of coercion, suggestion, adolescent fantasy, fright or despair. 387 U. S. at 55. We have no doubt that in confessing their activities the girls were in good measure yielding to the demands of their parents and pastor. On the other hand we reject as unwarranted the suggestion of counsel that "a significant conflict of interest between the interests of the parent and of the child" was thereby created, which itself contributed to a setting of custodial interrogation. The " 'paternal' urgings" or worse found suspect by *Gault* [3] are not those involved here where parents — alarmed and perhaps painfully made aware of their own inadequacy — demand from their children an accounting of their conduct. Furthermore, Cindy Spalding gave the complete answer to the question of the voluntariness of the girls' statements:

---

[3]. "In light of the observations of Wheeler and Cottrell [*Juvenile Delinquency—Its Prevention and Control*], and others, it seems probable that where children are induced to confess by 'paternal urgings' on the part of officials and the confession is then followed by disciplinary action, the child's reaction is likely to be hostile and adverse. . . ." 387 U. S. at 51, 52.

"A. Well, we more or less made it on our own. We figured we could save some more kids, but they gave us no rights or anything.

THE COURT: Give you what?

"A. Any kind of rights, we thought we were doing the State a favor."

## II

The Supreme Court has established that State juvenile proceedings "by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a State institution," must measure up to the essentials of due process and fair treatment. *Gault* at 13, 30. Some of the constitutional requirements which apply equally to a state criminal trial and the adjudicative phase of a state juvenile court delinquency proceeding are the rights to appropriate notice, to counsel, to confrontation and to cross-examination, and the privilege against self-incrimination. *McKeiver v. Pennsylvania*, 403 U. S. 528 (1971). These constitutional rights are also expressly required in juvenile delinquency hearings at the adjudicative stage by Maryland law. *See Matter of Anderson*, 20 Md. App. 31, 315 A. 2d 540 (1974), n. 18.

*Gault* made absolutely clear that its extension of the privilege against self-incrimination related only to a proceeding "to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed. . . ." At 41. Elsewhere it spoke of "the determination of delinquency, carrying with it the awesome prospect of incarceration in a state institution. . . ." *Idem,* at 36-37. While the Court observed that "the availability of the privilege *does not turn upon the type of proceeding in which its protection is invoked,* but upon the nature of the statement or admission, and the exposure which it invites," (emphasis added), this was said in reply to the argument that juvenile proceedings are "civil" and not "criminal" and therefore that the privilege should not apply to them. The Court went on to identify other "types" of proceedings: "The

privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory." The Court reasoned that it would be "entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement," since, at least as respects juvenile delinquency proceedings, these "may lead to commitment to a state institution," and

> "[i]ndeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult 'criminals.' In those States juveniles may be placed in or transferred to adult penal institutions after having been found 'delinquent' by a juvenile court. For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' "

The Court added that

> "* * * apart from the equivalence for this purpose of exposure to commitment as a juvenile delinquent and exposure to imprisonment as an adult offender, the fact of the matter is that there is little or no assurance in Arizona, as in most if not all of the States, that a juvenile apprehended and interrogated by the police or even by the Juvenile Court itself will remain outside of the reach of adult courts as a consequence of the offense for which he has been taken into custody. In Arizona, as in other States, provision is made for Juvenile Courts to relinquish or waive jurisdiction to the ordinary criminal courts. In the present case when Gerald Gault was interrogated concerning violation of a section of the Arizona Criminal Code, it could not be certain that the Juvenile Court Judge would decide to 'suspend' criminal prosecution in court for adults by proceeding to an adjudication in Juvenile Court." 387 U. S. at 49-51.

The quoted language from *Gault* is important, we think, as indicating the essential and grave concerns which caused the Court to penetrate the "feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings" and extend to them the safeguards of the Fifth Amendment: the juvenile delinquent may be committed to a state institution; [4] if so, he is without even the likelihood of assurance that he will be kept separate from adult criminals; and there is no certainty to begin with that he will remain outside of the reach of adult courts as a consequence of the offense for which he has been taken into custody, because of waiver provisions. It is in this context that we must examine the category entitled "Child in Need of Supervision" created by Chapter 432, Acts of 1969, of the General Assembly of Maryland.

This enactment substantially revised the law of Maryland governing juvenile causes. *In Re Hamill,* 10 Md. App. 586, 271 A. 2d 762 (1970). The purposes of the new subtitle, as set forth in the present Courts Art. § 3-802, [5] are:

> "(1) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle;

---

4. There "[h]is world becomes 'a building with whitewashed walls, regimented routine and institutional hours. . . . Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees and 'delinquents'. . . ." 387 U. S. at 27, quoting Mussomano, J. (dissenting), in Holmes Appeal, 379 Pa. 599, 616, 109 A. 2d 523, 530 (1954). Moreover, "It is of no constitutional consequence — and of limited practical meaning — that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time." *Ibid.*

5. Changing in style only Code, Art. 26, § 70 (1973 repl. vol.). The manner in which Chapter 2, Acts 1973, First Extraordinary Session of the General Assembly of Maryland repealed the provisions of the Annotated Code of Maryland dealing with courts and the judiciary and re-enacted them with revisions to be codified as a Courts and Judicial Proceedings Article, was set forth by Chief Judge Orth in Matter of Trader, 20 Md. App. 1, 3, 315 A. 2d 528, 530 (1974), n. 1.

(2) To remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior;

(3) To provide for a program of treatment, training, and rehabilitation consistent with the protection of the public interest;

(4) To place a child in a wholesome family environment whenever possible;

(5) To separate a child from his parents only when necessary for his welfare or in the interest of public safety."

The implications of the above stated objectives were explained by Chief Judge Murphy in *Hamill, supra,* in the following language:

"By so providing, it is clear that the Legislature intended no departure in philosophy from that underlying previous juvenile court enactments in Maryland, as interpreted by the Court of Appeals, *viz.,* that juvenile proceedings are of a special nature designed to meet the problems peculiar to the adolescent (*In Re Fletcher,* 251 Md. 520); that the proceedings of a juvenile court are not criminal in nature and its dispositions are not punishment for crime (*In the Matter of Cromwell,* 232 Md. 409); that the juvenile law has as its underlying concept the protection of the juvenile, so that judges, in making dispositions in juvenile cases, think not in terms of guilt, but of the child's need for protection or rehabilitation (*In Re Johnson,* 254 Md. 517); that the juvenile act does not contemplate the punishment of children where they are found to be delinquent, but rather an attempt to correct and rehabilitate them in 'a wholesome family environment whenever possible,' although rehabilitation may have to be sought in some instances in an institution (*Moquin v. State,* 216 Md. 524)."

More fully to effectuate the philosophy underlying juvenile law in Maryland, Chapter 432 created a "wholly new" category entitled Child in Need of Supervision, codified in Md. Code, Art. 26, § 70-1 (i) (1973 repl. vol.).[6] *In Re Arnold,* 12 Md. App. 384, 278 A. 2d 658 (1971). Such a child was classified as one:

"(1)  Subject to compulsory school attendance who is habitually and without justification truant from school;

(2)  Without substantial fault on the part of his parents, guardian, or other custodian, who is habitually disobedient, ungovernable, and beyond their control;

(3)  Who so deports himself as to injure or endanger himself or others; or

(4)  Who has committed an offense applicable only to children; and

(5)  Requires guidance, treatment or rehabilitation." [7]

On the other hand, § 70-1 (h) [8] defined a "Delinquent child" as a child "who commits a delinquent act and who requires supervision, treatment, or rehabilitation." A "Delinquent act" was defined in § 70-1 (g) as "an act which is in violation of Article 66½ of this Code, any other traffic violation, or an

---

6. Courts Art. § 3-801 (f).

7. The present Courts Art. § 3-801 stresses the requirement of a predicate finding that a child alleged to be in need of supervision is in need of "guidance, treatment or rehabilitation," by providing:

"(f) Child in need of supervision" means a child who requires guidance, treatment, or rehabilitation and:

(1)  Is required by law to attend school and who is habitually truant from school;

(2)  Is habitually disobedient, ungovernable and beyond control of the person having custody of him without substantial fault on the part of that person;

(3)  Deports himself so as to injure or endanger himself or others; or

(4)  Has committed an offense applicable only to children."

8. Courts Art. § 3-801 (k).

act *which would be a crime if done by a person who is not a child."*(Emphasis added.) [9]

Former § 52 of Article 26 had defined a delinquent child as:

> "* * * a child (1) who violates any law or ordinance, or who commits any act which, if committed by an adult, would be a crime not punishable by death or life imprisonment; (2) who is incorrigible or ungovernable or habitually disobedient or who is beyond the control of his parents, guardian, custodian or other lawful authority; (3) who is habitually a truant; (4) who without just cause and without the consent of his parents, guardian or other custodian, repeatedly deserts his home or place of abode; (5) who is engaged in any occupation which is in violation of law, or who associates with immoral or vicious persons; or (6) who so deports himself as to injure or endanger the morals of himself or others."

It is apparent that the category of CINS, while it contains a number of the acts formerly defined as delinquent, is indeed "wholly new." The Legislature, in revising the State law governing juvenile causes, was not satisfied to remove the "taint of criminality" from the definition of a delinquent child (by changing the clause "violates any law or ordinance" to include only traffic violations and eliminating the clause "engaged in any occupation which is in violation of law" formerly appearing in § 52 of Article 26). Nor did it stop with meeting one of the serious abuses identified in *Gault* by providing in Article 26, § 70-21 [10] that "No child shall be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of persons convicted of ´a crime." It went further and differentiated between juvenile acts which "would be a crime if done by a person who is not a child" (delinquent

---

**9.** Courts Art. § 3-801 (j): " 'Delinquent Act' means an act which is in violation of the State Vehicle Law, any other traffic violation, or an act which would be a crime if done by a person who is not a child."

**10.** Courts Art. § 3-832 (b).

acts) and acts which *under no circumstances* would be criminal (limited, in this respect, to "offenses applicable only to children"). This latter class of acts, cast more in the language of sociology than of the penal code, the Legislature grouped in a separate category, CINS, thereby formally recognizing a species of juvenile misconduct of lesser gravity, made up of a pattern of behavior which bears uniquely juvenile features and reflects the particular susceptibilities of youth — conduct to which, therefore, any analogy to adult criminal conduct is altogether inapplicable.

Article 26, § 70-16 [11] gives initial effect to this distinction between delinquent and non-delinquent misconduct by permitting waiver of juvenile jurisdiction to the criminal court "[a]fter a petition has been filed alleging delinquency," but, by negative implication, not after a petition alleging only need of supervision is filed. The Code thus insures that, as respects children in need of supervision, guidance, treatment or rehabilitation are to be the sole forms of State intervention. Courts Art. § 3-832 [12] makes plain, moreover, that within the juvenile system treatment of children other than delinquent children is to take a form specifically its own. Subsection (a) provides:

> "A child, except a delinquent child, may not be confined in an institution or other facility designed or operated for the benefit of delinquent children. This prohibition does not apply to facilities approved by the Juvenile Services Administration of the Department of Health and Mental Hygiene."

Until January 1, 1974, this provision was followed by Article 26, § 70-19 (b):

> "(b) If an adequate facility required by this section has not been established, the court may approve a facility under the supervision and control of the State departments of juvenile services, social

---

11. Courts Art. § 3-816, with stylistic changes.

12. Code, Art. 26, § 70-19. The State Department of Juvenile Services is now the Juvenile Services Administration.

services, mental hygiene and other appropriate child-care agencies, for temporary use as such facility; but the use of a facility which does not meet the requirement of this section may not continue beyond January 1, 1975."

Effective January 1, 1974, however, subsection (b) was replaced by the present Courts Art. § 3-832 (c):

"If a child is found to be neglected, in need of supervision, mentally handicapped or dependent, the court *may not confine the child in a juvenile training school or any similar institution.*" (Emphasis added.) [13]

Finally, it may be noted, pending adjudication a child alleged to be in need of supervision may not be placed in detention, defined by § 3-801 (m) in part as "the temporary care of children . . . in physically restricting facilities," for § 3-823 provides that:

"(a) . . . Detention is permitted only when a person is alleged or adjudicated to be a *delinquent* child." (Emphasis added.)

and:

"(d) . . . A child alleged to be neglected, dependent, or in need of supervision may not be placed in detention, but only in shelter care facilities maintained by the Department of Social Services or any home or facility maintained by the Department of Juvenile Services for the child in need of supervision.[14]

---

**13.** *Compare* N.Y. Family Ct. Act 756 (a): "For purposes of sections seven hundred and fifty-three [Disposition on adjudications of juvenile delinquency] and seven hundred fifty-four [Disposition on adjudication of person in need of supervision], the court may place the child in its own home or in the custody of a suitable relative or other suitable private person or a commissioner of social services or an authorized agency *including the state training schools* established under article seven of the social services law, or a youth opportunity center. . . ." (Emphasis added.)

**14.** Modifying Code, Art. 26, § 70-12 (d), which provided in part:

"A child alleged to be neglected or dependent or in need of

It is evident, we think, that an important purpose of the legislative revision of the juvenile code was to insulate certain forms of juvenile misconduct from the consequences of an adjudication of delinquency as described in *Gault*. The creation of the category of CINS reflects a studied design of the legislature to insure that treatment of children guilty of misconduct peculiarly reflecting the propensities and susceptibilities of youth, will acquire none of the institutional, quasi-penal features of treatment that in *Gault's* view had been the main difference between the theory and the practice of the juvenile court system. Under Maryland law, we have seen, a child may not be confined in an institution used primarily for the execution of sentences of convicted criminals; a child alleged in need of supervision cannot, based on that allegation, come within "the reach of adult courts" by means of waiver; he may not, upon adjudication, be confined in a facility designed or operated for the benefit of delinquent children, except as approved by the Juvenile Services Administration; and he may never be confined in a juvenile training school or any similar institution. In short, his correction and rehabilitation are designed to take place in an environment — of the group home, the foster home, or like unit — which duplicates as nearly as possible the intimacy, closeness and wholesomeness of the natural family environment. We would be poorly advised, admitting that the realities of juvenile rehabilitation may fall short of its ideals, to extend the analogy between criminal and delinquency proceedings — for purposes of the exposure to State intervention each invites and hence the precise forms of due process each must obey — to embrace a statutory scheme so clearly intended to substitute for institutional confinement modes of individualized juvenile rehabilitative treatment.

To do so, in our view, would be "to disallow the States to experiment further and to seek in new and different ways

---

supervision shall never be placed in detention, but only in shelter care facilities maintained by the Department of Social Services or any agency licensed by the Department of Social Services or any home or facility maintained by the Department of Juvenile Services for the child in need of supervision."

the elusive answers to the problems of the young. . . ." *McKeiver, supra* at 547. Nor would it "remedy the defects of the [juvenile] system" (*ibid.*) — defects that this statutory scheme is explicitly designed to remedy. In Maryland adjudicatory juvenile proceedings are subject to the rules of evidence. Rule 912 c. In Maryland a child who is a party is entitled by statute to representation by legal counsel at every stage of any juvenile proceeding. Courts Art. § 3-830 (d). We decline to go further and hold that in a proceeding upon a CINS petition due process requires that the child be permitted, on Fifth Amendment grounds, to have relevant evidence excluded and to refuse to testify. Such a holding, in a proceeding in which the protection and welfare of the child are of primordial concern, would not only "not strengthen greatly" but indeed would gravely impair "the fact-finding function, and would, contrarily, provide an attrition of the juvenile court's assumed ability to function in a unique manner." *Ibid.*[15] It should be noted that, as provided in Courts Art., § 3-834: "The proceedings in the juvenile court regarding a child are not admissible as evidence against him in criminal proceedings, prior to conviction, unless the charge is perjury."

---

**15.** Appellants cite three California cases, In Re Rambeau, 72 Cal. Rptr. 171, In Re R., 79 Cal. Rptr. 247, and In Re H., 85 Cal. Rptr. 359, and insist they "should be very persuasive upon this court" as supporting the view that, for purposes of extending the right against self-incrimination, delinquency proceedings and proceedings on a petition alleging need of supervision are the same. Those cases, however, involved allegations of conduct felonious under California law (including unlawful homicide and assault with a deadly weapon) but couched in the juvenile petition in the language of the wardship statute, namely, that respondents were "in danger of leading an idle, dissolute, lewd or immoral life" by committing the named acts. In each case the California court concluded that the "essential finding" of the lower court was that a felony or felonies had been committed notwithstanding their characterization, and held that respondents had therefore properly invoked Fifth Amendment rights. In each case the court was also careful to state what it was not deciding. Thus, in In Re H. it said at 365: "To what degree a self-incriminating statement may be admissible wherein nothing more than minor law offenses or a course of misbehavior are involved, we need not determine." Maryland's classification of child in need of supervision, as we have seen, is directed at just such "a course of misbehavior"; it is designed by its terms to exclude an "essential finding" of criminal misconduct. Here the court found that while the children had engaged in a course of misconduct of a particularly aggravated sort, they were essentially the victims both of lack of parental control and of the criminal acts of others.

## III

Appellants next contend that the court denied them due process "in not limiting its decision as to whether appellants were children in need of supervision to the single issue of 'ungovernable' alleged in the petition" and to which they had prepared their defense. The issue was not raised below and has not been preserved for appeal. Rule 1085.

In point of fact, however, each petition alleged at least that the respondent was in need of care and treatment and was 1) ungovernable and 2) had so deported herself as to be a danger to herself and others. It alleged particular facts that were the basis of these conclusions. The findings of the lower court, in turn, directly responded to these allegations. It found that the children had committed acts of the sort alleged; had habitually engaged in conduct, virtually before their parents' eyes, of which their parents could not have approved; had deported themselves so as to endanger themselves or others; and, as a result of the "traumatic experience," were in need of guidance, treatment and rehabilitation.

Rule 903 b 3 and 4 requires that the juvenile petition shall set forth "[t]he statutory classification of the act or condition causing the respondent to come under the jurisdiction of the court;" and: "[a] statement in simple and nontechnical language of such facts on which the action is based as are sufficient to establish the court's jurisdiction." The petitions here fully conformed to these requirements and we find no deprivation of procedural due process.

## IV

Counsel for Cindy Ann Spalding contends here, as he did before the hearing judge, that "when the delinquency petition was denied at the Master's hearing on March 7, 1973, all jurisdiction of the [Circuit Court for Baltimore County] was terminated" and the appellant was entitled to a summary dismissal or a transfer of the proceedings to Baltimore City. This claim is based upon Art. 26, § 70-4 [16]

16. Courts Art. § 3-818.

which provides that proceedings under the subtitle, except if delinquency is alleged, "shall be brought in the county where the child is living or domiciled." If delinquency is alleged, "the proceedings shall be brought in the county where the alleged delinquent acts occurred." The petition filed against Cindy alleged that she was *both* a delinquent child and a child in need of supervision and the implication of the statement of facts is that the delinquent acts occurred in Baltimore County.

Section 70-4 (Courts Art. § 3-818) applies to venue, not jurisdiction. The Court of Appeals has consistently held that the question of venue should be raised by preliminary motion, Rule 323 a, or by dilatory plea. *Easthman v. Young,* 250 Md. 516, 243 A. 2d 559 (1968). Judge Jenifer ruled, in his denial of the motion to dismiss:

> "THE COURT: Well, the motion will be denied for two reasons: The first reason is that the petition as filed alleging certain delinquent acts which were committed in Baltimore County, and under Subsection 1 of Article 70-4 entitled 'Venue' said delinquent act did occur in Baltimore County. The second reason is that I feel Section 70-4 of Article 26 is entitled 'Venue' and the question of venue should have been raised at the time of the original hearing before the Master in this case, so I'll deny the motion."

Had the question been timely raised, as stated above, the court, pursuant to § 70-5, could have exercised its discretion to transfer the proceeding to the place of domicile. Where delinquency is alleged (and clearly, we think, where it is accompanied by the lesser allegation of need of supervision), §§ 70-4 and 70-5 leave the determination of venue to the sound discretion of the court. Here, counsel failed to raise the venue question before the Master and also failed to request a transfer to Baltimore City. We find no error in the court's denial of the motion to dismiss.

## V

Appellants contend, finally, that the evidence does not sustain a finding that they are children in need of supervision in that it failed to show whether or not they "could be controlled and disciplined by their parents" or were "habitually" disobedient or ungovernable, based on testimony of events constituting a "one-time situation" in which the girls were essentially "abused and assaulted by various adults...."

Proof that a child is in need of supervision must be by a preponderance of the evidence. Code, Art. 26, § 70-18.[17] The decision of the lower court will not be set aside by this Court unless clearly erroneous. Rule 1086; *Matter of Smith,* 16 Md. App. 209, 295 A. 2d 238 (1972). The contention that upon this record the lower court erred in finding by a preponderance of the evidence that appellants were in need of guidance, treatment or rehabilitation, had shown themselves by repeated conduct to be beyond the control of their parents, and had deported themselves so as to endanger their own welfare, is patently without merit.

## VI

Appellants' brief contains a "Motion to Strike Portions of the Record" which precipitated a "Motion ne Recipiatur" filed separately by the appellee wherein the State "moves to strike" the brief of the appellants, or in the alternative, to expunge the motion "to strike."

Appellants' motion pertains to documents in the record transmitted to this Court which, it is contended, were not admitted into evidence at the hearing before Judge Jenifer. They include a school report of Victoria Elaine Carter, Children's Center social investigation reports and psychiatric evaluation reports of each child, memoranda of Juvenile Masters Kahl and Peach and Baltimore County Police reports. In support of the motion to strike it is said:

"Appellants do not know to what degree Judge

---

17. Courts Art. § 3-830 (c).

Jenifer used these documents in the decision and disposition of this case. The appellants have a constitutional right to confrontation and cross-examination of their accusers. *The means by which these documents were included in the record without the knowledge of the appellants, denied the appellants their constitutional rights.*" (Emphasis added.)

It is clearly the obligation of all counsel to examine the record in the lower court prior to its transmittal to this Court. Rule 1026 e then provides a mechanism for the determination by the lower court of differences with respect to matters properly includible in the record on appeal. If counsel have not assumed this responsibility prior to transmittal of the record, they may not be heard to complain. In any event, the motion to strike must be denied because the question presented has not been preserved for appellate review. Rule 1085. If it were before us, we would deny the motion because plainly the designated documents were properly before the court on disposition, after adjudication.

The State's motion ne recipiatur is also denied.

*Judgments affirmed; motions denied; appellants to pay the costs.*

*Mandate to issue forthwith.*