[Crim. No. 16985. Second Dist., Div. Two. Mar. 23, 1970.]

In re DONNIE H., a Person Coming Under the Juvenile Court Law.
KENNETH E. KIRKPATRICK, as Probation Officer, etc.,
Plaintiff and Respondent, v.
DONNIE H., Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, Kathryn J. McDonald, James L. McCormick, and Edward A. Germain, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Diana C. Woodward, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, J.**—This is an appeal from a judgment[1] of the juvenile court declaring Donnie, a minor, a ward of the court and from an order[2] of the court that a suitable placement order previously made remain in full force and effect.

### PROCEDURAL HISTORY

On February 18, 1969, a petition under the provisions of section 602 of the Welfare and Institutions Code was filed on behalf of Donnie, a minor of 14 years, alleging that on said date he had murdered Darryl Arnold and that he had committed an assault with a deadly weapon upon Jeffrey Arnold. On February 19, 1969, a detention hearing was held and Donnie appeared with counsel appointed by the court. A motion for trial by jury was heard and denied and the adjudication hearing was set for March 12, 1969. On March 12, 17 and 19, 1969, testimony was taken before a juvenile court referee who on the last date of the hearing dismissed the paragraph alleging murder but prior thereto added a paragraph to the petition alleging that the minor had violated section 192 of the Penal Code (manslaughter). The referee sustained the paragraphs alleging assault with a deadly weapon and manslaughter and on April 10, 1969, the minor was

---

[1]Welfare and Institutions Code section 800 provides in part: "A final order . . . declaring any person to be a person described in Section 600, 601 or 602, . . . may be appealed from in the same manner as any final judgment, . . ."

[2]As the order prescribing that the minor be suitably placed by the probation department is included as an integral portion of the judgment, such order is not separately appealable and the purported appeal from said order must be dismissed.

made a ward of the court under section 602 of the Welfare and Institutions Code. The court further ordered that the minor be suitably placed by the probation department.

A request for rehearing was heard and granted and the said rehearing commenced on May 28, 1969. At that time a request was made on behalf of the minor for a trial by jury which request was denied. A request was also made that the court employ the "reasonable doubt" standard used in criminal cases instead of the "preponderance of evidence" rule normally applied in juvenile court proceedings. This request was granted. On June 2, 1969, the court dismissed the two paragraphs (assault with a deadly weapon and manslaughter) which had originally been sustained by the referee and added an additional paragraph alleging that the "Minor is in danger of leading an idle, dissolute, lewd or immoral life, in that on or about February 14, 1969 . . . he did unlawfully kill Darryl Arnold, without malice; and unlawfully committed an assault with a deadly weapon upon the person of Jeffrey Arnold." This last mentioned paragraph was sustained and the court 'adjudgd the minor a ward of the court under section 601 of the Welfare and Institutions Code and ordered that the suitable placement order previously made by the referee remain in full force and effect. The minor appealed.

## STATEMENT OF FACTS

The hearing before the court consumed the better part of three trial days. A total of 14 witnesses were called to testify and numerous exhibits were introduced. A recitation of sufficient portions of the evidence will be set forth to enable this court to dispose of the issues raised on appeal.

In February 1969, Levi and Stella Arnold resided in Los Angeles with their three children, Robert, Jeffrey and Darryl, aged 4, 3 and 18 months respectively. Both of the parents were employed, the father working a shift beginning at 4:30 p.m. and ending at 3:30 a.m. and the mother working a shift beginning at 4:30 p.m. and ending at 2 a.m.

On Thursday afternoon, February 13, 1969, Mrs. Arnold left her youngest son Darryl at the home of Mrs. Josephine King who was ·a sister of Donnie. When the mother returned at about 2:20 a.m. on February 14 to pick up the child she observed an injury on Darryl's head and blood on his shirt. Mrs. King told Mrs. Arnold that Darryl also had a lump on the right side of his rib cage, that he kept falling asleep and that the baby should be taken to a doctor. Mrs. Arnold stated that she would take her son to a doctor if he did not improve.

Early on the morning of February 14, 1969, Donnie, aged 14 years, appeared at the apartment of another of his sisters, Mrs. Gurtha Allen, and requested permission, which was granted, to remain in her home to watch

television while she went on an all day trip to San Diego. Mrs. Allen, whose apartment was next door to the Arnolds, had been the regular baby sitter for the three Arnold children but she had advised Mrs. Arnold several days prior to the 14th that she would be unable to care for the children on that particular day.

At about 2 p.m. on the 14th, Mrs. Arnold arrived at the Allen residence, discovered Donnie there and requested that he care for her children while she and her husband went to their places of employment. Donnie acceded to her request although he had never been responsible for the children on any prior occasion. According to testimony given by Mrs. Arnold and supported by testimony of her husband, at the time the children were left in Donnie's care neither Darryl nor Jeffrey had any marks on their bodies except for the previously described bump on Darryl's head. Both of the Arnolds denied that there were any old healed abrasions on Jeffrey's back.[3] This testimony was highly suspect and undoubtedly completely untruthful.

Sometime between 5 and 5:30 p.m. on February 14, 1969, Arthur La Point arrived at the apartment where he observed Darryl and Jeffrey lying on the floor in positions which led him to believe the two boys were asleep. Donnie was watching television with the oldest Arnold child, Robert. Sometime after 6 p.m. La Point made sandwiches for the boys and at that time he noticed two cuts on Jeffrey's head and "a lot of old scars on his back." La Point asked Donnie if he had caused the injuries and the boy answered in the negative. La Point then inquired of the four-year-old Robert if his father had whipped Jeffrey before going to work and Robert answered in the affirmative.[4] La Point, in order to get some assistance, started for the home of a neighbor, Mrs. Bessie Cunningham, and enroute encountered her daughter, Shirley Cunningham, who went to the apartment and recovered Jeffrey. Donnie then appeared and told Mrs. Cunningham that as he was putting a diaper on Darryl, the baby stopped breathing. Mrs. Cunningham went to the apartment to observe Darryl who appeared to her to be

---

[3]This testimony, however, was refuted by a report dated February 15, 1969, from the U.S.C. County Medical Center which diagramed old healed abrasions on Jeffrey's back which appeared to be long scar tissue marks apparently caused by use of a strap. The Arnolds' testimony was further refuted by Police Officer Willie Meyer who stated that on February 14 when he examined Jeffrey's back he saw injuries which had healed over. Similar testimony was elicited from Arthur La Point. Dr. Robert Shapiro, the doctor who examined the children at the emergency clinic on February 14, testified "that there were some scars and bruises that appeared older on both children." Police Officer Harold Hand testified that on February 15 he saw "injuries on the back [of Darryl] which were not fresh, they were five to ten days old. They appeared to be - - well, they looked to me like they might have been made by a coat hanger. These had healed over. There were five or six of these type of adhesions."

[4]One of the rescue squad men asked Robert if the father had whipped Jeffrey for being a bad boy and Robert again responded "Yes."

dead. Donnie related to the Cunninghams that the boys were "like that when . . . their mother brought them over."

Shirley Cunningham telephoned Mrs. Arnold and thereafter called the rescue squad of the fire department which responded to the emergency. Shortly thereafter police officers arrived and after questioning La Point the officers talked with Donnie for 30 to 35 minutes. In general they asked him if he had "chastised" or "struck" the children or if he "knew how the children were bruised." Donnie denied any knowledge of what had occurred. The police then decided to take Donnie to the station for questioning.

At about 8 p.m., Sergeant Jack Garrison of the Los Angeles Police Department arrived at the station. He talked with Donnie for approximately five minutes and was told by the minor that he had observed the injuries on the children at the time he began to babysit with them and that Robert had stated that the boys' father had beaten the two younger children earlier in the afternoon. Donnie was then left alone for about 45 minutes. Garrison returned for a short talk with Donnie and then again left the minor alone for approximately 30 to 40 minutes.

At 9:30 p.m. Garrison returned and asked Donnie "if he realized that if he hit someone or injured someone physically that this was wrong." Donnie then admitted that he had struck the two boys "because they wouldn't behave." The interview then stopped; Donnie was placed under arrest; and for the first time was advised of his constitutional rights as delineated in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The minor had been at the police station for several hours prior to the time he was placed under arrest, and according to the testimony of Garrison, Donnie was not free to leave during that period of time.

Garrison inquired of Donnie if he wished to waive his constitutional rights and talk to the officer without an attorney being present. Donnie indicated a willingness to relate what had occurred during the time he was acting as a baby sitter. As Donnie made his statement, Garrison reduced the same to writing. Thereafter the document was read to Donnie and he affixed his signature at the end of the same.

Donnie related how the three small Arnold children had been left in his care and when the two younger boys, Jeffrey and Darryl, started "acting up" he admonished them to remain quiet. The children refused to heed his order and Donnie picked up a flat heeled shoe belonging to his sister and struck Jeffrey "10 or 11 times" on the backsides of the child and perhaps on the head. Donnie did not believe that he hit the child with the heel of the shoe although he admitted there was a possibility that he may have done

so. As it appeared that striking Jeffrey with the shoe was painful, Donnie went next door to secure something lighter. There he found a belt and returned with it to the apartment. Darryl was playing with a broken television set and Donnie "hit Darryl on the legs with the belt. He stopped messing with the T.V."

Later Donnie went to the store, leaving the children alone for a few moments, and when he returned he discovered Jeffrey standing on a chair at the kitchen sink and playing in the water. The child was completely wet as was Darryl who was standing near Jeffrey in the kitchen. According to Donnie he again struck Jeffrey on the back using an open hand. At that time he noticed welts covering Jeffrey's back. No further punishment was administered to Darryl but both children were ordered to lie down and they complied. The balance of Donnie's statement was substantially in accord with the testimony given by La Point and by the Cunninghams.

On the basis that Donnie had not made a knowing and intelligent waiver of his constitutional rights, the trial judge refused to admit into evidence the statement of Donnie with respect to the two paragraphs filed under section 602 of the Welfare and Institutions Code. The trial judge, however, on his own motion amended the pleadings as previously mentioned and added a fourth paragraph under section 601 of the Welfare and Institutions Code. The statement of the minor was admitted in support of the amended paragraph. The trial judge in admitting Donnie's statement held that ". . . a waiver would not be necessary in a civil trial."

The autopsy examination of Darryl was conducted by Dr. Horace L. Speer of the coroner's office. He testified that in his opinion either one or two injuries would have been sufficient to cause death, namely, (1) an injury to the head which caused a considerable amount of hemorrhaging, and (2) injuries to the abdomen which resulted in a distinct laceration through the substance of the liver causing massive hemorrhaging.[5] The witness could not state whether the injuries were inflicted simultaneously and could only testify that in his opinion the injury to Darryl's forehead probably occurred within 24 hours of death.

Dr. Speer further testified that an individual suffering such wounds to the liver might live up to 12 hours and remain conscious and ambulatory. In the case of the brain injury, death might or might not be instantaneous and the witness could not estimate how long a person might survive after

---

[5] It is of considerable interest to note that Dr. Speer identified the spot where the liver was located and the same was the approximate spot that Stella Arnold admitted was pointed out to her during the early morning hours of the day Darryl died when she picked up her child. At that time there was a lump on the right side of Darryl's stomach.

an injury of that type. The symptoms of such a hemorrhage, short of a coma, might vary from dizziness to unconsciousness and a person suffering such an injury might experience trouble in staying awake and would have difficulty in breathing.

By way of defense, Donnie's mother, Mrs. H., testified that she was the mother of seven children and that in her home it was an acceptable method of punishment to strike a child with a shoe or a belt and that Donnie had witnessed her whip her four-year-old with both implements.

Mrs. H. further testified that she had observed Mr. Arnold grab Darryl from the arms of his wife, throw the baby into a chair causing the infant to strike his head on a chair and threatened to "break his neck" if he did not stop crying.[6] She related witnessing other instances of Mr. Arnold's severe treatment of the children.

Sheryl H., a minor and apparently a relative of Donnie, also testified that she had observed incidents of brutality on the part of Mr. Arnold toward a minor child who was residing with the family. La Point and Mrs. Gurtha Allen testified to other incidents indicating Mr. Arnold administered whippings to his wife and his children, using considerable force in so doing.

Dr. Robert Shapiro was called as a witness for the defense. He was the attending physician at the Watson Medical Clinic where the two Arnold children were taken immediately after the discovery of their injuries. He testified that Darryl was dead when he first observed him and although he noticed injuries to both children, he saw no fresh blood on either child. He expressed the opinion that the injuries could have occurred from a matter of hours up to a day or two.

Other witnesses were called by both the petitioner and by the defense but their testimony was largely cumulative and need not be related in this opinion.

### DISPOSITION OF APPEAL

Appellant has presented on appeal many separate contentions. We will limit our discussion only to such errors which we deem to have been so prejudicial as to require a reversal.

■ At the outset it must be mentioned that if appellant had been an adult and tried in a criminal department of the superior court and if that court also denied admission into evidence of the statement made by appellant, it is inconceivable that any court or jury could have returned a finding

---

[6]Mr. Arnold testified that he had never threatened Darryl or been angry with him.

of guilt of either the charge of assault with a deadly weapon or of manslaughter. The insufficiency of the evidence is glaringly apparent. Not only was it impossible to determine whether Darryl had received the injuries from which he subsequently died prior to the time he was placed in the care of Donnie but each of the two children had many scars and welts obviously caused by the use of excessive force by the father in the administration of punishment. Without Donnie's statement there was no evidence of his participation in any incident other than the fact that the children had been placed in his custody for several hours before their condition was discovered.

 As stated in *People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777]; "In resolving that contention [challenge to criminal judgment on the grounds of insufficiency of the evidence] the appellate court is required to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt [Citations.] The prosecution's burden is a heavy one. 'To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence.' [Citation.] Accordingly, in determining whether the record is sufficient in this respect the appellate court can give credit only to 'substantial' evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value' . . . ." (See also *People* v. *Redmond,* 71 Cal.2d 745 [79 Cal.Rptr. 529, 457 P.2d 321].) Under the facts set forth, *supra,* it is obvious that had the matter been tried in a criminal court, it could not be properly concluded that the prosecution sustained its burden of proving the appellant guilty beyond a reasonable doubt.

We must further point out that the trial judge, correctly, we believe, refused to admit appellant's statement with respect to the paragraphs of the petition filed pursuant to the provisions of section 602 of the Welfare and Institutions Code, to wit, that appellant had committed two felonies. No supportable solution was possible under such circumstances other than the dismissal of the said two paragraphs of the petition. This was the action the trial court took.

We now address ourselves to the key question of the cause before this court. May a juvenile court judge in a case where a minor is charged with the commission of felonies and who having denied admission into evidence of a statement of a minor upon the grounds that the same was procured in violation of his constitutional rights, thereafter accept said statement in support of a petition to declare the minor a ward of the court under section

601 of the Welfare and Institutions Code? We are of the opinion that under the facts before this court the same may not be done.

Appellant correctly points out that *In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], indicates that the rule of exclusion declared in *Miranda* v. *Arizona, supra,* applies in juvenile court proceedings. (See *In re H.L.R.,* 269 Cal.App.2d 610, 616 [75 Cal.Rptr. 308]; *In re Rambeau,* 266 Cal. App.2d 1 [72 Cal.Rptr. 171]; *In re Teters,* 264 Cal.App.2d 816 [70 Cal. Rptr. 749]; *In re Daniel R.,* 274 Cal.App.2d 749 [79 Cal.Rptr. 247]; *In re R.L.,* 3 Cal.App.3d 100 [83 Cal.Rptr. 81].)

■ The trial judge erroneously admitted the minor's statement upon a misconception of the law. Such receipt into evidence was proper, the court concluded, as it was being "offered in a civil trial, as an exception to the hearsay rule." As stated in *In re Gault, supra,* at pages 49, 50 [18 L.Ed.2d at pp. 558, 559]: ". . . it is argued that juvenile proceedings are 'civil' and not 'criminal,' and therefore the privilege should not apply. It is true that the statement of the privilege in the Fifth Amendment, which is applicable to the States by reason of the Fourteenth Amendment, is that no person 'shall be compelled in any *criminal case* to be a witness against himself.' However, it is also clear that the availabiltiy of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. . . .

"It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to 'criminal' involvement. In the first place, juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination. To hold otherwise would be to disregard substance because of the feeble enticement of the 'civil' label-of-convenience which has been attached to juvenile proceedings."

As the trial judge improperly admitted into evidence the statement of the minor we are then confronted with the principle enunciated in *People* v. *Spencer,* 66 Cal.2d 158, 163 [57 Cal.Rptr. 163, 424 P.2d 715]: "Having concluded that defendant's confession should not have been admitted into evidence, we consider next whether its erroneous introduction caused prejudice to defendant. We have held that use of a confession violative of *Escobedo* and *Dorado* [and unquestionably, *Miranda*] necessarily compels reversal of the resulting conviction since a confession so completely shatters a defendant's case that its erroneous use at his trial works incalculable dam-

age and precludes a finding of harmless error notwithstanding overwhelming extrinsic evidence of guilt. [Citations.]" A fortiori we must reverse when there is little substantial evidence of guilt.

This court is cognizant of the fact that many of the acts and courses of conduct described in section 601 of the Welfare and Institutions Code[7] fall far short of the type of delinquency allegedly attributable to the minor before this court. To what degree a self-incriminating statement may be admissible wherein nothing more than minor law offenses or a course of misbehavior are involved, we need not determine. However, in the cause before us the essential findings relied upon by the trial judge to sustain the amended petition under said code section were that the minor was "in danger of leading an idle, dissolute, lewd, or immoral life" by reason of the fact that he had committed two serious felonies, to wit, manslaughter and assault with a deadly weapon. Yet these were the very same felonies charged in the petition under section 602 of the Welfare and Institutions Code that the trial judge had dismissed.

The trial judge by use of the device of dismissing the paragraphs of the petition properly brought under section 602 of the Welfare and Institutions Code and adding a paragraph under section 601 of said code stripped the minor of the protection against self-incrimination afforded by *In re Gault, supra.* The courts may not alter or eliminate constitutional rights of a minor in such a manner.

Even though the amended petition was filed under section 601, the minor rightly may demand that proof of the allegation of the *commission of felonies* must meet the same standards as if the petition was brought under section 602, namely, a preponderance of evidence legally admissible in the trial of *criminal* cases. (Welf. & Inst. Code, § 701.) The trial court ruled that Donnie's statement could not be received in evidence to support the petition filed under said section 602. It should not have been received to sustain the petition filed under section 601. "Thus, a confession illegally obtained cannot be relied upon to support a finding that the minor committed a crime." (*In re Rambeau, supra,* at p. 8.) (See also *In re Buros,* 249

---

[7]Section 601 of the Welfare and Institution Code reads as follows: "Any person under the age of 21 years who persistently or habitually refuses to obey the reasonable and proper orders or directions of his parents, guardian, custodian or school authorities, or who is beyond the control of such person, or any person who is a habitual truant from school within the meaning of any law of this State, or who from any cause is in danger of leading an idle, dissolute, lewd, or immoral life, is within the jurisdiction of the juvenile court which may adjudge such person to be a ward of the court."

Cal.App.2d 55, 57 [57 Cal.Rptr. 124]; *In re Daniel R., supra,* at p. 754.) The purported appeal from the order of suitable placement is dismissed. The judgment is reversed.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied April 8, 1970.