# MATTER OF SPALDING

[No. 59, September Term, 1974.]

*Decided, February 13, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Gerard Meola,* with whom was *Richard J. Habiger* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp* and *James I. Keane, Assistant Attorneys General,* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 709 *infra.*

In the landmark decision of *In re Gault,* 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court held, for the first time, that various of the federal constitutional guarantees accompanying ordinary criminal proceedings are applicable, in certain instances, to state juvenile delinquency cases. Those safeguards, all embraced within fundamental procedural due process, are: Notice of charges; the right to counsel; confrontation and cross-examination; and the privilege against self-incrimination. Appellant seeks to extend that holding — with specific reference to self-incrimination — to another area of juvenile court jurisdiction in Maryland, known as "Children in Need of Supervision" (CINS).[1]

The Court of Special Appeals in *Matter of Carter and Spalding,* 20 Md. App. 633, 318 A. 2d 269 (1974), upheld the decision of the Circuit Court for Baltimore County sitting as a Juvenile Court, rejecting appellant's claim. We granted certiorari to consider whether statements made to the police by appellant — then 13 years of age — should have been suppressed; whether she was denied her constitutional right to refuse to testify; and whether she should have been permitted to cross-examine a police officer with regard to both voluntariness of the statements made to him and the warnings mandated by *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966).

---

1. In addition to juvenile delinquency and CINS cases, juvenile courts in Maryland also possess exclusive original jurisdiction over children alleged to be dependent; neglected; or mentally handicapped.

In the early morning hours of January 31, 1973, Officer Joseph W. Price, a member of the Baltimore County Police Department assigned to the Dundalk station, responded on instructions from his headquarters to a call from City Hospital to investigate a possible rape and overdose of narcotics. There, he was met by a Mr. Carter, who advised him that his daughter, age 11, had taken a white tablet which had impaired her speech, had caused a loss of equilibrium and had dilated her pupils. She had also admitted to her parents that she had engaged in sexual intercourse with an adult male on January 29 in an apartment immediately below that occupied by her family. She contrived this visit by climbing down from her bedroom window. When questioned by the police officer, the child acknowledged the episode of the 29th, and added that on the same occasion she had engaged in sexual acts with others who were present including two women. The Carters had brought their daughter to the hospital because they wanted her examined for possible sexual intercourse and treated for the drug.

Later that morning, at approximately 6:30 A.M., Officer Price again met with the Carter family at the Dundalk police station. Also there in response to a phone call from the officer were appellant and her mother. The minister of the church attended by both families was also present. Officer Price and one of his superiors then proceeded to interrogate both girls under somewhat disorganized conditions. Much of this appears to have resulted from interference by both the minister, who exercised considerable influence over the girls, and the parents. Ultimately, with permission of the latter, Officer Price obtained written statements from both girls. The officer later testified that the parents had ". . . insisted on the girls giving the information. They were at sometime, they were [sic] some yelling at the girls and the girls being upset, crying, they were trying to calm them down. They were trying to help and assist getting all the information they could."

In her oral and written statements to the police that

morning, as well as in her statements subsequently given to Juvenile Bureau detectives, appellant admitted her participation in the same events of the 29th as had been described by the Carter youngster. In doing so, she supplied the names of all those who had been in attendance on that occasion. She also recounted additional episodes of similar sexual activity in the basement of her home with male boarders residing there; and at a number of other "parties" in the apartment below that occupied by the Carters. She was able to attend these early-morning functions, amounting to nothing less than orgies at which adults and juveniles were in heavy attendance, by placing a sleeping pill in her mother's coffee. She was furnished the pills, and was driven to those bizarre parties by one Sheldon B. Coon, who apparently was the impresario of the "sex ring." He gave a pill to the girls on each occasion immediately before they departed from their residences, and again before they engaged in sexual intercourse. This seems to have had a narcotic-like influence on them.

After the police had struggled through their various interrogation procedures on the 31st, they took the girls to the Parkville police station, with the approval of the Department of Juvenile Services, where they were detained overnight. This step was taken because the statements furnished by the girls disclosed assaults upon them by Coon, who threatened to kill them if they ever revealed information to anyone concerning the parties. The official report filed by the police specified "protective custody" as the reason for the detention. Once the police had completed the interviews, they immediately sought arrest warrants for the large number of adults identified by the girls. The men in this group were charged with "statutory rape" and the women with "unnatural and perverted sexual practices." In both instances, the two girls were listed as victims.

On the following morning, February 1, 1973, both girls were brought before Juvenile Master Kahl pursuant to petitions of the Department of Juvenile Services, which charged each with being a "delinquent child" and "in

need of supervision,[2] within the meaning and intent of Section 70-2 of Article 26 of the Annotated Code of Maryland." [3] The Master found both girls to be in need of care and treatment, but, significantly, did not find them to be "delinquent." [4] His memorandum, dated February 1, 1973, is quoted here:

> "Police investigation indicates that these young girls have been *victimized* by a group of adults in the Dundalk area and elsewhere, for purposes of sexual abuse and drug experimentation. It is not known at this point just how much damage has already been done, physically and psychologically, to these girls. The situation is one of the most serious that I have encountered in my four years with the Juvenile Court.

> "Both girls are in need of medical treatment immediately, and notwithstanding whatever wishes the parents of the girls may have at this time, *I find them to be Children In Need Of Supervision* and am committing them to the Department of Juvenile Services for placement, with the intention that they shall be immediately admitted to the University Hospital *for medical evaluation and treatment.*

> "On February 7, 1973, they are to be transported

---

2. The reasons assigned for these allegations are:

". . . investigation by the Baltimore County Police Department revealed that the respondent had consumed controlled and prohibitive [sic] narcotics and engaged in acts of sexual intercourse and sexual perversion with an unknown number of male and female adults for a period of more than one year. The respondent is ungovernable and beyond the control of her parent, deports herself in such a manner as to be a danger to herself and others and is in need of care and treatment."

3. Art. 26 was repealed effective January 1, 1974, and juvenile causes are now covered by Maryland Code (1974) § 3-801 *et seq.*, Courts and Judicial Proceedings Article.

4. In fact, the petition previously referred to above appears to contain the only official suggestion of delinquency in the record. Ironically, the "complaint" form of the Department of Juvenile Services, apparently completed on either the 31st or 1st, lists "child in need of supervision" as the sole "offense description."

to the Maryland Children's Center for evaluation and return to Court one month thereafter." (emphasis added).

During the ensuing month, extensive psychiatric and family studies were conducted at the Maryland Children's Center.

On March 7, 1973, immediately upon their return from the Children's Center, the girls attended a hearing before Juvenile Master Peach. Armed with the thorough reports and comprehensive recommendation of the Children's Center, he adjudicated each girl to be "a child in need of supervision" and "in need of care and treatment." He therefore "committed both of them to the Department of Juvenile Services for placement and planning so that they can receive some therapy to help them cope with the problems which I am sure lie ahead for both of them." Exceptions to the findings and recommendations of the Master were duly noted on behalf of each juvenile, accompanied by a request for a *de novo* hearing before the court.

Pursuant to the exceptions and requests, the cases came on for trial on May 3, 1973, before the Circuit Court for Baltimore County sitting as a Juvenile Court (Jenifer, J.), where extensive testimony and argument ensued in accordance with Maryland Rule 908. Shortly before the trial commenced, a written motion was filed on behalf of appellant aimed at suppressing the statements made by her to the police, to the Juvenile Service workers and to the staff of the Children's Center. At the outset of the trial, the court announced that it would reserve its ruling on that motion.

During the course of the trial, objections to the admissibility of those statements were renewed on the grounds that the fourfold *Miranda* warnings had not been given by any of the interrogating officers prior to or during any questioning.[5] Officer Price, however, had announced to all those assembled at the police station that "anything they

---

5. Only the statements made to the police are included within the ambit of our review pursuant to the Writ of Certiorari.

said could be used against them in a court of law if they were charged." This colloquy also appears in the testimony:

"MR. MEOLA: Your Honor, I would like to question the officer about what warning he did give these children.

"THE COURT: I don't think he has to give any warning. *They were not in custody for the commission of a crime or for a delinquency petition at this time.* They were volunteered statements given with the consent at the insistence of the parents. The *Miranda* warning doesn't apply to these statements, gentlemen." (emphasis added).

It is this refusal that laid the groundwork for one of the three questions framed by the Writ of Certiorari.

Later in the trial, when asked by the court to describe how he elicited the statements from the girls, Officer Price stated "They volunteered all of this information to begin with, and it was so bizarre I started asking questions to try to pinpoint dates and time and individuals." The confusion which reigned at the police station and the abbreviated warning announced by Officer Price are demonstrated in this excerpt from his testimony:

"Q Okay, you stated earlier the parents were shouting at the girls?

"A Everybody was yelling at each other trying to get information, specifically from Elaine [Carter], because she was still under the influence of drugs, trying to get through to her. The parents were upset.

"Q You stated earlier the girls were crying?

"A Yes, I did, from the yelling of the parents.

"Q Whom did you make the statement to the statement they made would be used against them, to whom did you make that statement?

"A I made it to everyone in the room there,

anything they said could be used against them in a court of law.

"THE COURT: Did you go any further?

"A Yes, sir, if they were charged with a crime, named offense.

"Q Was this while they were quiet or were they still yelling?

"A Everybody was milling around. I had a little bit of trouble with Reverend Gatling there. I had to threaten to arrest him just to keep him quiet.

"Q Do you know for certain that the parents heard that statement?

"A I cannot be certain anybody heard anything."

In the course of their testimony, Officer Price and the detectives from the Juvenile Bureau were permitted, over objection, to state what the girls had said during the various interviews. Then, an announcement by the prosecuting attorney that he proposed to call appellant to the stand as a witness drew a vigorous objection from counsel on the ground of self-incrimination. Prior to any definitive ruling by the court, however, she was shown her written statement given to Officer Price on January 31, and confirmed the truth of its contents. She also acknowledged on her direct testimony that she knew Coon and certain of the other persons for whom adult warrants had been issued. When asked by her own counsel whether anyone at the police station had informed her that she was not required to make any statements, she replied:

"A Well, we more or less made it on our own. We figured we could save some more kids, but they gave us no rights or anything.

"THE COURT: Give you what?

"A Any kinds of rights, we thought we were doing the State a favor.

"THE COURT: Well, as I understand that you said you made the statement on your own?

"A Yes."

At the conclusion of the trial, the court rendered its decision orally, finding that the evidence overwhelmingly had established the girls to be in need of supervision because they had "deported themselves so as to injure or endanger themselves or others" and therefore required "guidance, treatment, or rehabilitation." These findings were incorporated into written orders, which also committed the girls to the jurisdiction of the Department of Juvenile Services for placement in foster homes with prescribed visitation rights granted to their parents. It is from those orders that the appeal was taken to the Court of Special Appeals.[6]

The contentions that the statements made to the police should have been suppressed at the court hearing; and that cross-examination of the police officer should have been permitted regarding the voluntariness of those statements and the *Miranda* warnings were rejected by the Court of Special Appeals on the basis that the questioning of the police at the hospital and at the police station was not custodial interrogation within the meaning of *Miranda.*

In holding the appellant's compelled testimony did not violate her privilege against self-incrimination, the Court of Special Appeals carefully traced the enactment of the jurisdictional category, "Child in Need of Supervision," created by Chapter 432 of the Laws of 1969. As Judge Moore noted for the court, such a child refers to one who is:

> " '(1) Subject to compulsory school attendance who is habitually and without justification truant from school;
>
> (2) Without substantial fault on the part of his parents, guardian, or other custodian, who is habitually disobedient, *ungovernable,* and beyond their control;
>
> (3) *Who so deports himself as to injure or endanger himself or others;* or

---

6. Having been released to her parents following the decision by the Court of Special Appeals, the Carter girl did not petition this Court for a Writ of Certiorari.

(4) Who has committed an offense applicable only
to children; and

(5) Requires guidance, treatment or rehabilita-
tion.' " (emphasis added). 20 Md. App. at
649.

This classification, therefore, stands in marked contrast to a
"Delinquent child," defined as one " 'who commits a
delinquent act and who requires supervision, treatment, or
rehabilitation.' [Subject to the provisions of Art. 26, § 70-2
(d),] a 'Delinquent act' was defined in § 70-1 (g) as 'an act
which is in violation of Article 66½ of this Code, any other
traffic violation, or an act *which would be a crime if done by
a person who is not a child.*' " (Emphasis in original). 20 Md.
App. at 649-50.[7]

Essentially, then, the Court of Special Appeals stressed
the basic statutory distinctions between the delinquency and
CINS categories, taking particular care to emphasize the
differences in disposition which are prescribed for each. For
example, Code (1957, 1966 Repl. Vol., 1972 Supp.) Art. 26, §
70-19, applicable at all times material to these proceedings,
provided:

"(a) If a child is found to be neglected,
delinquent, in need of supervision, mentally
handicapped, or dependent, the court may make
disposition as most suited to the physical, mental,
and moral welfare of the child; but *no child (except
a delinquent child)* may be confined in an
institution or other facility designed or operated for
the benefit of delinquent children, provided that
this prohibition shall not apply to facilities
designed by the State Department of Juvenile
Services of the Department of Health and Mental
Hygiene.

---

7. Appropriate statutory references to Art. 26, then applicable to these
proceedings, and to the recodification which took effect on January 1, 1974,
were made by the Court of Special Appeals. We deem it unnecessary to
repeat them here.

"(b) If an adequate facility required by this section has not been established, the court may approve a facility under the supervision and control of the State departments of juvenile services, social services, mental hygiene and other appropriate child-care agencies, for temporary use, as such facility; but the use of a facility which does not meet the requirement of this section may not continue beyond January 1, 1975." (emphasis added).

And § 70-21 also provided, in relevant part, that "No child shall be committed or transferred to a penal institution or other facility used primarily for the execution of sentences of persons convicted of a crime." [8]

The Court of Special Appeals summed it all up in stating:

"It is evident, we think, that an important purpose of the legislative revision of the juvenile code was to insulate certain forms of juvenile misconduct from the consequences of an adjudication of delinquency as described in *Gault.* The creation of the category of CINS reflects a studied design of the legislature to insure that treatment of children guilty of misconduct peculiarly reflecting the propensities and susceptibilities of youth, will acquire none of the institutional, quasi-penal features of treatment that in *Gault's* view had been the main difference between the theory and the practice of the juvenile court system. . . ." 20 Md. App. at 653.

Thus, it "decline[d] to go further and hold that in a proceeding upon a CINS petition due process requires that the child be permitted, on Fifth Amendment grounds, to have relevant evidence excluded and to refuse to testify." *Id.* at 654.

---

8. Both appellee and the Court of Special Appeals have noted that in the 1974 recodification, § 3-832 added a prohibition against confinement "in a juvenile training school or any similar institution" for all categories except delinquency. This was not effective, however, in May 1973.

We shall affirm, finding it necessary, however, to decide only that the Fifth Amendment privilege against self-incrimination is inapplicable to this proceeding. Because we so hold, the related questions of *Miranda* warnings and voluntariness are subsumed within that holding. "The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth." *In re Gault, supra,* 387 U. S. at 47, 87 S. Ct. at 1454.

Since this case derives its impetus from *Gault,* we pause for a careful examination of the relevant facts on which that decision is bottomed. The conduct which precipitated the police action there consisted of "lewd or indecent remarks" allegedly made during a telephone call to the female complainant. As a consequence, Gault was charged with being, and was found by a juvenile court judge to be, a "delinquent child."

Under the Arizona Juvenile Code, not unlike its Maryland counterpart, the definition of a "delinquent child" includes one "who has violated a law of the state . . . ." The Arizona Criminal Code provided "that a person who 'in the presence or hearing of any woman or child . . . uses vulgar, abusive or obscene language, is guilty of a misdemeanor. . . .' The penalty specified in the Criminal Code, which would apply to an adult, is $5 to $50, or imprisonment for not more than two months." 387 U. S. at 8-9, 87 S. Ct. at 1434. Gault, who was then 15, was committed as a juvenile delinquent to the State Industrial School " 'for the period of his minority [that is, until 21], unless sooner discharged by due process of law.' " 387 U. S. at 7-8, 87 S. Ct. at 1433 (brackets in original).

Although some disagreement existed over what had transpired at the juvenile court hearing, there being no transcript or recording of those proceedings, it is apparent that *Gault* was predicated on alleged admissions made in response to questions propounded by the juvenile court

judge. Since the complainant did not appear, the adjudication of delinquency appears to have rested solely on those admissions. Neither Gault nor his parents were advised that he was not required to testify or make a statement, or that an incriminating statement might result in his commitment as a "delinquent." As we have already intimated, Gault was not represented by counsel.

In *Gault*, the Court did not deal with the totality of the relationship between the juvenile and the state; indeed, it did not even consider the entire process applicable to juvenile "delinquents."

> ". . . We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution. As to these proceedings, there appears to be little current dissent from the proposition that the Due Process Clause has a role to play. . . ." 387 U. S. at 13, 87 S. Ct. at 1436.

Turning to the issue of self-incrimination, the Court again emphasized that it was ". . . concerned only with a proceeding to determine whether a minor is a 'delinquent' and which may result in commitment to a state institution." 387 U. S. at 44, 87 S. Ct. at 1452. This same emphasis was repeated in even stronger terms when the Court said that ". . . juvenile proceedings to determine 'delinquency,' which may lead to commitment to a state institution, must be regarded as 'criminal' for purposes of the privilege against self-incrimination." 387 U. S. at 49, 87 S. Ct. at 1455. Thus, the scope of *Gault* is clear. When the Supreme Court ". . . conclude[d] that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults," 387 U. S. at 55, 87 S. Ct. at 1458, it was referring to a proceeding to determine "delinquency," *viz.*, ". . . an act which would be a crime if done by a person who is not a child," which is the statutory definition in

Maryland. The test enunciated in *Gault,* however, is two-pronged. In addition, the "delinquency" must be such that it may result in commitment to a state institution.

That *Gault* must be so read is confirmed, we think, by subsequent decisions of the Supreme Court. To the panoply of constitutional safeguards extended by *Gault* has subsequently been added the requirement of proof beyond a reasonable doubt, *In re Winship,* 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970). "The Court held in *In re Winship* . . . that proof beyond a reasonable doubt is among the essentials of due process and fair treatment that must be afforded at the adjudicatory stage *when a juvenile is charged with an act that would constitute a crime if committed by an adult." Ivan V. v. City of New York,* 407 U. S. 203, 92 S. Ct. 1951, 32 L.Ed.2d 659 (1972) (applying *Winship* retroactively) (emphasis added). *See McKeiver v. Pennsylvania,* 403 U. S. 528, 537, 91 S. Ct. 1976, 29 L.Ed.2d 647 (1971).

Whatever else is established by *Gault,* it is clear that labels are not controlling in determining the applicability of the Due Process Clause to juvenile proceedings. In regard to the first "prong" of the test, for example, it is doubtful that the *Gault* result would have been different had merely the title of the proceedings been changed from "delinquency" to "CINS," and all else had remained the same. The essential element is that the juvenile be charged with an act which would be a crime if committed by an adult. In *In re Winship, supra,* the Court relied on *Gault* in answering affirmatively the question "whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage *when a juvenile is charged with an act which would constitute a crime if committed by an adult."* 397 U. S. at 359 (emphasis added). The Court later added that ". . . intervention [by a juvenile court] cannot take the form of subjecting the child to the stigma of a finding that he violated a criminal law and to the possibility of institutional confinement on proof insufficient to convict him were he an adult." *Id.* at 367. *See Ivan V. v. City of New York, supra,* 407 U. S. at 203.

Labels are equally unimportant in terms of the second "prong," confinement in a state institution. As the Court said:

> ". . . A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence — ' and of limited practical meaning — that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a 'receiving home' or an 'industrial school' for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes 'a building with whitewashed walls, regimented routine and institutional hours . . . .' [9] Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and 'delinquents' confined with him for anything from waywardness to rape and homicide." *In re Gault, supra,* 387 U. S. at 27, 87 S. Ct. at 1443.

"A proceeding where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution." 387 U. S. at 36, 87 S. Ct. at 1448. Finally, the Court added: "For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it be called 'criminal' or 'civil.' " 387 U. S. at 50, 87 S. Ct. at 1455.

In sum, then, Due Process requires that various of the federal constitutional guarantees accompanying ordinary criminal proceedings, specifically including the privilege against self-incrimination, be made applicable at the adjudicatory stage of those juvenile proceedings in which the act charged would constitute a crime if committed by an

---

**9.** Quoting from Holmes' Appeal, 379 Pa. 599, 616, 109 A. 2d 523, 530 (1954) (Musmanno, J., dissenting).

adult *and* which may result in confinement of the child to a state institution.

Other state courts that have considered the question of which proceedings should invoke an application of the *Gault* rights have reached similar conclusions. For example, California's statutory scheme is quite similar to Maryland's, an apparent difference, however, being that delinquent and CINS children may be sent to the same institutions under the California Code.[10] In that state, "[j]uveniles are entitled to the fundamental protection of the Bill of Rights in proceedings that may result in confinement or other sanctions, whether the state labels these proceedings 'criminal' or 'civil.' (citations omitted)." *M. v. Superior Court of Shasta County,* 4 Cal. 3d 370, 375, 93 Cal. Rptr. 752, 756, 482 P. 2d 664 (1971).

The California courts have consistently held that CINS children [11] are entitled to the same guarantees as delinquent children when they are charged with an act which would be a crime if committed by an adult, *M. v. Superior Court of Shasta County, supra,* 93 Cal. Rptr. at 758 (". . . juveniles, like adults, are constitutionally entitled under the Due Process Clause to proof beyond a reasonable doubt at the adjudicatory stage when they are charged with an act which would constitute a crime if committed by an adult.");[12] *In re D,* 23 Cal.App.3d 1045, 100 Cal. Rptr. 706, 708 (1972) ("Since the minors are not accused of wrongdoing [under § 600] the constitutional mandates applicable to hearings pursuant to Welfare and Institutions Code §§ 601 and 602 . . . have no relevancy."); *In re R,* 274 Cal.App.2d 749, 79 Cal. Rptr. 247, 250 (1969) ("Where, however, the proof of the allegation rests solely upon the admissions of the minor, . . . the minor

---

**10.** The California Welfare and Institutions Code provides for three categories: § 600 (dependent or neglected child), § 601 (essentially CINS), and § 602 (delinquent children).

**11.** The term CINS is not used in California; instead the reference is to § 601 children.

**12.** Section 702.5 of the California Welfare and Institutions Code specifically gives the right against self-incrimination to § 601 and § 602 children, but this statutory provision has not been the rationale of these cases.

may rightly contend that proof of such allegations of the commission of a felony must be under the same standards as if the petition were under § 602 [delinquency] . . ."); *In re Rambeau*, 266 Cal.App.2d 1, 72 Cal. Rptr. 171, 176-77 (1968) (juvenile protected against self-incrimination "where the essential finding of the court is that a felony . . . has been committed.")

Illustrative of the label fallacy is *In re H*, 5 Cal.App.3d 781, 85 Cal. Rptr. 359 (1970). In that case, a juvenile was charged under § 602 [delinquency] with assault with a deadly weapon and manslaughter. The sole evidence against him was his confession that he struck the child for whom he was babysitting. The confession was suppressed, as having been illegally obtained, and the petition was dismissed. The trial judge, on his own motion, however, promptly amended the petition to charge the juvenile with being "in danger of leading an idle, dissolute, lewd or immoral life" under § 601 [CINS]; and then admitted the confession and sustained the petition, since the defendant was no longer charged with "delinquency." The Court of Appeal reversed, holding:

> "Even though the amended petition was filed under section 601 [CINS], the minor rightly may demand that proof of the allegation of the *commission of felonies* must meet the same standards as if the petition was brought under section 602 [delinquency], namely, a preponderance of evidence legally admissible in the trial of *criminal* cases. . . . 'Thus, a confession illegally obtained cannot be relied upon to support a finding that a minor committed a crime.' (citations omitted)." 85 Cal. Rptr. at 366. (emphasis in original).

In Florida, the reasonable doubt standard is applied in the adjudicatory phase of a delinquency proceeding where the act of delinquency charged is one which would constitute a crime if committed by an adult. *State v. V.D.B.*, 270 So. 2d 6 (Fla. 1972). "Despite the fact that the courts have with consistency recognized the civil character of juvenile

proceedings, nonetheless, it is now well established that in delinquency proceedings based upon a charge of violation of criminal law (which if proved could lead to loss of liberty) criminal due process standards apply. . . ." *In Interest of E. P.*, 291 So. 2d 238, 239 (Fla. App. 1974).

Similarly, the Rhode Island Supreme Court has held: "Where the state attempts to have a juvenile declared wayward or delinquent because he violated a state criminal statute, the state must prove beyond a reasonable doubt each and every element of the offense charged." *In re Pereira*, 306 A. 2d 821, 823 (R.I. 1973). On the other hand, *Gault* rights have been held not to apply "in a juvenile proceeding where no public offense is charged." *In re Henderson*, 199 N.W.2d 111, 119 (Iowa 1972); *In re D, supra*, 100 Cal. Rptr. at 708.

We turn then to Cindy Ann Spalding. The state contends that the *Gault* rights do not apply to CINS because of the significant differences between those proceedings and delinquency cases. It cites these dissimilarities: CINS children may not be confined in institutions designed or operated for the benefit of delinquent children; CINS children may not be placed in detention;[13] and CINS children may not be waived to adult criminal courts. Also, in the teeth of the *Gault* teaching that labels are of little consequence, the State nevertheless argues that the label "CINS" bears significantly less stigma than "delinquent." Finally, the State claims that, having been placed in a foster home, appellant was not committed to a "state institution" because shelter care and foster homes are not in that category.

Understandably enough, appellant maintains that "CINS" children, though treated differently in certain respects, are

---

**13.** Code (1974), § 3-823 of the Courts and Judicial Proceedings Article, effective January 1, 1974, so provides; but as we have already observed, it is the statutory scheme applicable in May 1973 that governs this case. At that time, Art. 26, § 70-12 permitted detention of CINS children, but not in a jail or other facility used for detention of adults charged with a criminal offense and children adjudicated or alleged to be delinquent. Moreover, even this statutory prohibition was riddled with exceptions.

the same as "delinquent" children for the purpose of applying *Gault* rights. She emphasizes that at the time of her hearing, she conceivably could have been confined with delinquent children; that she could have been committed to a "state institution," and thus compelled to leave her home with a resulting curtailment of her freedom; that she is now one step closer to incarceration; and that she was charged with violating a criminal statute. Although there is much to commend these arguments, we need not decide whether the second prong of the *Gault* test, *i.e.*, potential confinement of the child to a state institution, mandated an application of the privilege against self-incrimination in this case. We reach this conclusion because, in any event, we think that appellant was not *charged* in this proceeding with an act which would constitute a crime if committed by an adult.

As we noted earlier, the petition filed on February 1, 1973, did allege that appellant was both a "delinquent child" and a "child in need of supervision." The reasons assigned for these allegations were the consumption of narcotics, the acts of sexual intercourse and perversion practiced upon her, and her ungovernability. But, in the context of all the material events which ensued during the critical period, since she was, in fact, a victim, the charge of "delinquency" in the petition must be regarded as simply an unexplained anomaly.

The testimony describing the circumstances at the hospital and the police station clearly depicts the girls as victims of "sex" crimes committed by the adults. That this was the position of the police is borne out not merely by their subsequent testimony, but also by their immediate application for adult arrest warrants listing the girls as victims; the overnight detention for the purpose of "protective custody"; and the total absence of suggested criminality on the part of the girls in any police records.

Even within the Department of Juvenile Services, the "delinquency" charge is out-of-step with every other official record or entry pertaining to the girls. Its own complaint form, completed on the same day as the petition, lists "child

in need of supervision" as the single "offense description."
Again, on that same day, February 1, the Master referred to
the girls as having "been victimized by a group of adults,"
found them to be "in Need of Supervision" and omitted any
mention of "delinquency." Nothing in their four-week
commitment to Maryland Children's Center for psychiatric
evaluation was inconsistent with this official attitude. Nor
do the reports and recommendations of that institution
reflect a contrary view.

In sum, with the elimination of the delinquency "charge"
by the Master on February 1, the claims of alleged
"criminal" conduct, on which it was premised, vanished with
it. What remained was the single allegation that appellant
". . . is ungovernable and beyond the control of her parent,
deports herself in such a manner as to be a danger to herself
and others and is in need of care and treatment." From that
time forward, at least, appellant was not charged in this
proceeding with any acts which would constitute a crime if
committed by an adult.

As we have said, we do not find it necessary to rest our
decision on the second prong of the test laid down by *Gault*,
pertaining to possible confinement in a "state institution." It
is sufficient to hold that since appellant was not charged
with an act which, in the circumstances of this case, would
constitute a crime if committed by an adult, the privilege
against self-incrimination is not applicable to these
proceedings.

> *Judgment affirmed; appellant*
> *to pay costs.*

*Eldridge, J., dissenting:*

The majority's decision in this case cannot be reconciled
with *In re Gault*, 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527
(1967), and later Supreme Court cases dealing with the
constitutional rights to be accorded accused children in
juvenile proceedings. *See In re Winship*, 397 U. S. 358, 90 S.
Ct. 1068, 25 L.Ed.2d 368 (1970); *McKeiver v. Pennslyvania*,

403 U. S. 528, 91 S. Ct. 1976, 29 L.Ed.2d 647 (1971); *Ivan V. v. City of New York,* 407 U. S. 203, 92 S. Ct. 1951, 32 L.Ed.2d 659 (1972).

The majority opinion, in my view, correctly construes *Gault,* and the subsequent Supreme Court cases, as setting forth a two-pronged test for determining whether the Fifth Amendment privilege against self-incrimination is applicable to a juvenile proceeding. The test is: (1) whether the juvenile "is charged with an act that would constitute a crime if committed by an adult," *In re Winship, supra,* 397 U. S. at 359; *Ivan V. v. City of New York, supra,* 407 U. S. at 203; and (2) whether the child may be "subjected to the loss of his liberty," or whether the proceedings "may result in commitment to a state institution," *Gault, supra,* 387 U. S. at 36, 44, 49.

Moreover, as the majority opinion in this case seems initially to acknowledge, labels are not controlling as to either aspect of the test. It does not matter whether the name of the proceedings is "delinquency" or "child in need of supervision" ("CINS"), or whether the loss of liberty may be commitment to an "industrial school" or a "receiving home." *Gault, supra,* 387 U. S. at 24, n. 31, 27. The child's entitlement to the protection of the privilege against self-incrimination depends upon the substance of the matter, namely whether he or she is charged with an act that would be a crime if committed by an adult and whether the proceedings could result in a deprivation of liberty.

Despite an apparent recognition of these principles by the majority in this case, and specifically a recognition that labels are not controlling, the majority opinion goes on to make the labels "victim" and "CINS" determinative. Although the acts by petitioner Cindy Ann Spalding which caused these proceedings, and her subsequent deprivation of liberty, would have been criminal acts if committed by an adult, the majority labels her the "victim" of "sex crimes." Based upon this label, and the fact that the charge and title of the proceedings were later limited to a "child in need of supervision," the majority denies petitioner the

constitutional right not to incriminate herself and upholds the action of the trial court in compelling her to take the witness stand and testify against herself.

There can be no question in this case about the fact that the original basis for the charges against petitioner, and one of the grounds for the ultimate adjudication of a "child in need of supervision," was her commission of acts which would have constituted crimes if committed by an adult. In the petition to the juvenile court, filed February 1, 1973, Cindy Ann Spalding was charged with being a delinquent child and a child in need of supervision. The only specific facts alleged in the petition as a basis for the charges were that "respondent has consumed controlled and prohibited narcotics and engaged in acts of sexual intercourse and sexual perversion with an unknown number of male and female adults for a period of more than one year." It was also alleged, without any additional supporting facts being set forth, that Cindy Ann Spalding was "ungovernable and beyond the control of her parent" and was "a danger to herself and others."

The juvenile court master, Mr. Kahl, on February 1, 1973, signed a "Commitment Order," which recited that Cindy Ann Spalding has been adjudged a child in need of supervision and which committed her to the custody of the Department of Juvenile Services. The "Memorandum" of Master Kahl which accompanied that order stated, "Police investigation indicates that these young girls have been victimized by a group of adults in the Dundalk area and elsewhere, for purposes of sexual abuse and drug experimentation." Other than a reference to the fact that the girls needed medical treatment, the sexual conduct and drug abuse constituted the only facts or basis set forth in the memorandum for the commitment order.

On March 7, 1973, petitioner was returned from the Maryland Children's Center and was committed to the custody of the Department of Juvenile Services by Juvenile Court Master Peach. In Master Peach's memorandum accompanying the order committing petitioner, he referred

to her "participation in unbelievable sex orgies" and the use of drugs. While the master also referred to the fact that petitioner had not been attending school and had been in the habit of sleeping until two or three o'clock in the afternoon, there is no doubt that the behavior which furnished in large part the basis for the commitment order was engaging in "sex orgies" and drug abuse.

At the juvenile court trial itself, testimony offered by the prosecution to sustain the charge of "child in need of supervision" largely related to the girls' use of narcotics, to petitioner's having "drugged" her mother, and to the "sex orgies." The trial judge, in his opinion delivered at the end of the trial adjudicating petitioner and her co-defendant to be "children in need of supervision," found as a fact that the girls "have been associated in immoral sexual activities" and have "indulged" in the taking of "drugs of a narcotic nature." While the trial judge also placed some weight upon petitioner's failure to attend school, there is no question but that the sexual and drug abuse activities furnished the principal factual basis for the judge's adjudication and commitment order.

Of course, using "controlled and prohibited narcotics" and engaging in "acts of . . . sexual perversion," to use the language of the petition against Cindy Ann Spalding, are serious crimes in Maryland. Maryland Code (1971 Repl. Vol., 1974 Cum. Supp.), Art. 27, § 554, punishes "unnatural or perverted sexual practices" of the type which petitioner was alleged to have committed, by a maximum sentence of ten years in the penitentiary. Art. 27, § 276 *et seq.*, the "Controlled Dangerous Substances" law, sets forth various criminal penalties for the use of prohibited narcotic drugs. Petitioner was clearly "charged with . . . act[s] that would constitute . . . crime[s] if committed by an adult," *In re Winship, supra,* 397 U. S. at 359; *Ivan V. v. City of New York, supra,* 407 U.S. at 203, and these acts furnished a large part of the basis for the ultimate "CINS" adjudication and commitment.

The majority opinion states that there is a "marked contrast" between the "delinquent" classification and the

"CINS" or "child in need of supervision" classification.[1] However, as this case illustrates, criminal conduct may furnish the factual basis for the "CINS" adjudication. For example, "CINS" includes children who are "habitually disobedient, ungovernable, and beyond [their parents'] control." Code (1974), § 3-801 (f) (2) of the Courts and Judicial Proceedings Article. The evidence of such characteristics, as in this case, may be criminal acts. "CINS" also includes a child who "[d]eports himself so as to injure or endanger himself or others," § 3-801 (f) (3) of the Courts and Judicial Proceedings Article. Of course, a child who commits criminal acts such as using narcotic drugs or "drugging" someone else, is deporting herself "so as to injure or endanger" herself or others. This is why "labels" should not be, and under the Supreme Court's decisions are not, controlling.

While not dealt with in the majority opinion, the other "prong" or requirement of the *Gault* test was also met in this case. While petitioner was in fact committed to a "foster home" instead of an "institution," forced living for a period of years in a "foster home" and away from one's own home and family is a "loss of his liberty," *Gault, supra*, 387 U. S. at 36. Moreover, even if commitment to a foster home, and against the will of the child and her parents, would not be deemed to meet the second requirement of the *Gault* test, petitioner was subjected to the possibility of commitment to an institution. Code (1972 Repl. Vol., 1974 Cum. Supp.), Art. 52A, § 5 (c), specifically authorizes a juvenile court judge to commit a "CINS" child "to any public or private institution . . . ." As to limitations upon this authority, the pertinent statute in effect at the time of petitioner's trial, Code (1966 Repl. Vol., 1972 Cum. Supp.), Art. 26, § 70-19, authorized confinement of a "CINS" child in an institution provided that the institution were not designed or operated for the benefit of delinquent children. There were exceptions even to

---

1. Actually, as the opinion of the Court of Special Appeals in this case points out, much of what is now contained in the "CINS" definition was formerly included in the definition of a "delinquent" child. Matter of Carter and Spalding, 20 Md. App. 633, 650, 318 A. 2d 269 (1974).

that proviso. The present statute, Code (1974), § 3-832 (c) of the Courts and Judicial Proceedings Article, adds the further limitation to the authority to commit "CINS" children to institutions, requiring that such institutions may not be juvenile training schools or something similar to juvenile training schools. Limitations upon the nature of the institutions to which "CINS" children may be committed do not change the fact that under Maryland law, a child adjudicated to be in need of supervision may be committed to "an institution of confinement in which the child is incarcerated for a greater or lesser time." *Gault, supra,* 387 U. S. at 27.

The two-pronged test of *Gault* was therefore met in this case. Petitioner was charged with acts that would be crimes if committed by adults, and petitioner was subjected to the prospect of a loss of liberty or confinement in an institution. Consequently, under *Gault,* the Fifth Amendment privilege against self-incrimination was fully applicable to this proceeding.

There can be no doubt in this case that the petitioner's Fifth Amendment rights were violated. At no time were the warnings required by *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974, *reh. den.* 385 U. S. 890, 87 S. Ct. 11, 17 L.Ed.2d 121 (1966), given. Both the trial court and the Court of Special Appeals stated that petitioner was not yet in custody when her incriminating statements were first made to the police on January 31, 1973, and therefore under *Miranda* warnings were not required. This view of what constitutes "custody" is a dubious one. The Supreme Court in *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U. S. at 444. Here, petitioner was brought to the police station by her mother at 6:30 a.m. on January 31, 1973, following a phone call from the investigating police officer and a request from the officer that she be brought to the station. As far as the record

shows, she has never been at liberty to return home since that time. She was interrogated during the day at the station, gave a written statement, and was then taken to another police station where, with the approval of the Department of Juvenile Services, she was "detained" overnight. On the following morning, February 1, 1973, petitioner was formally charged and committed to the custody of the Department of Juvenile Services. To say that petitioner was not in custody from and after the morning of January 31, 1973, is to be unrealistic. Moreover, even if it be assumed *arguendo* that petitioner was not yet in custody on January 31st, the record shows that after the first hearing before the juvenile master and the commitment order on February 1st, petitioner was interrogated further by the police and the juvenile authorities, gave information to them, and no *Miranda* warnings were given at those times either.

Finally, wholly apart from the matter of *Miranda* warnings, petitioner's Fifth Amendment rights were violated when at the trial she was compelled, over her attorney's objection, to take the witness stand and testify against herself. At the trial, after several prosecution witnesses testified, the following took place:

> "MR. NEWELL [prosecuting attorney]: I call Cindy Ann Spalding to the stand.
>
> "MR. MEOLA [petitioner's attorney]: Objection.
>
> "THE COURT: Well —
>
> "MR. MEOLA: I instruct my witness not to testify at all. She may be —
>
> "THE COURT: All right, take the stand, Cindy, step up to the stand. All right, you'll be sworn first."

Petitioner was then examined extensively by the trial judge and the prosecuting attorney. Objections made by her attorney to incriminating questions were ignored or overruled. The language of the Fifth Amendment is that "No person . . . shall be compelled in any criminal case to be a

witness against himself . . . ." No more clear-cut violation of that provision could be imagined than what occurred at petitioner's trial.

The majority opinion in this case could have significant consequences. Because Cindy Ann Spalding is labelled a "victim," and because the proceedings are called "CINS" instead of "delinquent," she is deemed not entitled to those constitutional rights which the Supreme Court has held are applicable in juvenile proceedings. However, if petitioner was a "victim," anytime a juvenile is engaged in criminal activity with adults, the juvenile could be said to be a "victim." A teenager might be enticed by an adult into engaging in a series of armed robberies with the adult, and could be viewed as a "victim." Turning to the name of the proceeding, since criminal acts may be the basis for "CINS" proceedings, and since an adjudication that a child is in need of supervision may lead to confinement in an institution for as long a period as an adjudication that he is delinquent, virtually all juvenile proceedings could be labelled "CINS" by the authorties without significant consequences. Thus by using the right labels, *i.e.*, "victim" and "CINS," the police and juvenile authorities will be able to by-pass the requirements laid down by the Supreme Court in *Gault*.